COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
CIVIL ACTION
NO.

*10 - 2652*
*BLS*

---

NOMIR MEDICAL TECHNOLOGIES, INC.
Plaintiff

v.

MCDERMOTT WILL & EMERY LLP,
SIMONA LEVI-MINZI, MARK LAPPIN and
G. MATTHEW MCCLOSKEY,
Defendants

---

## COMPLAINT

I.   INTRODUCTION

1.   This is an action for legal malpractice arising out of the failure of the defendants to timely and properly pursue and protect patent applications on behalf of the plaintiff resulting in the negligent abandonment of several applications and other losses.  The applications represented clinically proven breakthrough technology of tremendous value for the treatment of infectious disease, and the plaintiff's core technology.  The plaintiff has suffered damages in excess of $143 Million.  The plaintiff brings claims for negligence, fraud, negligent misrepresentations, breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing and unfair and deceptive practices in violation of G.L. c. 93A.  The plaintiff seeks damages, including lost profits, as well as multiple damages, attorneys' fees and costs pursuant to G.L. c. 93A, section 11.

II.    PARTIES

2.      The plaintiff, NOMIR Medical Technologies, Inc. ("NOMIR") is a Massachusetts corporation organized and existing under the laws of the State of Delaware with a principal place of business in Massachusetts located at 307 Waverley Oaks Rd, Waltham, Middlesex County, MA 02452.

3.      The defendant, McDermott Will & Emery LLP ("MWE") is a limited liability partnership organized and existing under the laws of the State of Illinois with a principal place of business in Massachusetts located at 28 State Street, Boston, Suffolk County, MA 02109.

4.      The defendant, Simona Levi-Minzi ("Levi-Minzi") is a natural person with a last and usual place of business located at McDermott Will & Emery LLP, 201 S. Biscayne Blvd, #2200, Miami, Florida 33131.

5.      The defendant, Mark Lappin ("Lappin") is a natural person with a last and usual residence located at 29 Bakers Hill Road, Weston, Middlesex County, MA 02493-1760.

6.      The defendant, G. Matthew McCloskey ("McCloskey") is a natural person with a last and usual place of business located at McDermott Will & Emery LLP, 28 State Street, Boston, Suffolk County, MA 02109.

III.   FACTS

7.      At all times material hereto, NOMIR has been a medical device company, with a product pipeline of optical energy therapies for multiple clinical applications.

8.      At all times material hereto, Dr. Eric Bornstein ("Bornstein") has been NOMIR's Chief Scientist, Chairman of the Board of Directors and also a stockholder.

9.      At all times material hereto, MWE has been engaged in the business of providing legal services and advice, and in particular, legal services and advice in the business of patent

2

prosecutions.

10.    MWE has held itself out to the public, and to NOMIR in particular, as a law firm with expertise in the field of patent law.  As stated by MWE on its website:

    a.    "Our patent prosecution lawyers are experienced in all aspects of prosecution practice."

    b.    Members of MWE's Intellectual Property ("IP") Department are "uniquely capable of handling intellectual property matters in virtually every technical or scientific discipline."

11.    In reliance on MWE's representations, NOMIR placed its trust in MWE to safeguard its IP and in about 2004 NOMIR retained MWE to pursue and protect NOMIR's patent applications and patents.

12.    Between 2005 and 2008 MWE charged NOMIR over $1,100,000 in IP legal fees.

13.    At all times material hereto, Lappin, Levi-Minzi, and McCloskey were agents, servants, employees, and/or partners in MWE acting within the scope of their authority and with the knowledge and consent of MWE.

The 013 Application

14.    On or about October 8, 2004, Levi-Minzi, a partner in MWE's Miami office, filed on behalf of NOMIR a certain patent application no. 10/961,796, MWE Docket No. 72287-0013 (the "013 Application") titled, "Use of Secondary Optical Emission as a Novel Biofilm Targeting Technology."

15.    Levi-Minzi filed the 013 Application at the request of Mark Lappin, a partner in MWE's Boston office, who was responsible for NOMIR's IP work.

16.    At all times material hereto, MWE utilized a docketing system whereby docket entries relative to patent matters were to be entered, and reminders were to issue when responses to U.S. Patent and Trademark Office ("USPTO") actions became due.

17.     On or about January 12, 2005, the USPTO issued to MWE a Notice to Provide Missing Parts. That notice set a period of two months from the mail date.

18.     Lappin, Levi-Minzi and MWE had a professional obligation and duty to timely respond to the USPTO's actions and to the Notice to Provide Missing Parts in particular.

19.     As a result of problems, defects and/or deficiencies in MWE's patent docketing system, of which MWE was aware or should have been aware, no timely reminder issued to alert MWE that a response was due.

20.     As a law firm that holds itself out as an expert in the field of patent law, MWE had a duty to maintain a reliable patent docketing system and to hire competent people to diligently implement that patent docketing system.

21.     According to MWE's partner, Toby Kusmer ("Kusmer") the non-filing of the response to the USPTO's Notice to Provide Missing Parts was due to MWE's "docketing system failure." See, Supplement Petition for Revival filed by MWE, par. 2.

22.     Kelly O'Neill ("O'Neill") was the docketing manager employed by MWE in its Boston office in the relevant time frame. Id. par. 4.

23.     According to Kusmer, although it was O'Neill's responsibility, as docketing manager, to notify the responsible individuals of the due date for the response to the Notice to Provide Missing Parts, such reminders "were not provided." Id.

24.     According to Kusmer, O'Neill left MWE in July, 2005, and "left behind numerous docketing problems. Id. par. 5.

25.     As a law firm that holds itself out as an expert in the field of patent law, MWE had a duty to ensure that the partner responsible for IP work provided adequate supervision of those to whom he delegated same.

4

26.     According to Kusmer, Lappin "was the partner responsible for NOMIR's intellectual property work" during the time the 013 Application was abandoned.  See, Supplemental Petition for Revival, filed by MWE, par. 1.

27.     On information and belief, Lappin provided no substantive supervision of anyone involved with the NOMIR account.

28.     When the defendants failed to either timely respond or obtain an extension of time to respond, the 013 Application became abandoned on March 13, 2005, and remained abandoned for over 2½ years.

29.     On or about September 22, 2005, the USPTO issued to MWE a Notice of Abandonment for MWE's failure to timely or properly reply to the Notice to Provide Missing Parts.

30.     Furthermore, MWE failed to exercise due care in the control of NOMIR's files and records and these files and records were misplaced by MWE.  These files and records included the 013 Application papers, filing receipt, Notice to Provide Missing Parts stamped as received by MWE, and the Notice of Abandonment.

31.     In November, 2005, Lappin left MWE and Levi-Minzi became responsible for NOMIR's IP work.

32.     On or about July 7, 2007, McCloskey, a partner in MWE's Boston office, learned that the 013 Application was abandoned.

33.     MWE did not notify NOMIR of this abandonment until 41 days later on or about August 17, 2007.

34.     During the 2½ years between March 13, 2005, and August 17, 2007, MWE issued status reports to NOMIR, including reports in April and July, 2007, falsely advising NOMIR that

the 013 Application was in good standing before the USPTO.

35.    Levi-Minzi, McCloskey, and MWE knew at this time that NOMIR was soliciting investments from the marketplace based upon its patent protected core technologies and that its "survival" depended thereon.  See Petition to Accelerate filed by MWE, par. 1.

36.    Levi-Minzi, McCloskey and MWE knew in particular, without limitation, that NOMIR was soliciting funds from private investors in reliance on the false belief that the 013 Application was in good standing before the USPTO and had not been abandoned. Id. par. 1 and 2.

37.    Levi-Minzi, McCloskey and MWE also knew that a member of NOMIR's Board of Directors had business relationships with a large publicly traded company interested in the 013 Application technology.

38.    Levi-Minzi, McCloskey and MWE inexplicably did not inform NOMIR of the abandonment until August 17, 2007, and only after being questioned about same by Bornstein and NOMIR's President, Richard Burtt ("Burtt").

39.    The extensive delay by MWE in notifying NOMIR (March 13, 2005 to August 17, 2007) and the interim false status reports issued by MWE reporting the 013 Application to be in good standing, misled NOMIR to believe that the 013 Application was in fact in good standing, although this was untrue.

40.    At no time did NOMIR intend to abandon the 013 Application or to authorize MWE to allow the 013 Application to become abandoned.  At all times material hereto, NOMIR believed that the 013 Application was pending.

41.    NOMIR relied upon the pendency of the 013 Application in connection with various contemplated business and financing transactions up to and including August 17, 2007.

42.     NOMIR would have responded to the abandonment sooner had MWE shared the information with NOMIR on a timely basis. This response would have included immediately notifying existing and potential investors about the problem, which NOMIR had a contractual, fiduciary, and ethical obligation to do.

43.     As a result of the aforesaid abandonment, certain investors in NOMIR delayed payment of approximately $1.4 Million in investment money which was due September 30, 2007, pending revival of the 013 Application.

44.     The delay in receipt of this investment money adversely impacted capital spending necessary for NOMIR to meet its expenses for the remainder of 2007 and complete scheduling clinical trials. NOMIR immediately suspended two time-crucial activities:  (1) fundraising and (2) required clinical study of the 013 technology. NOMIR incurred additional cost as a result thereof, and the suspensions also resulted in substantial damage to NOMIR's reputation.....

45.     Among other things, investors now questioned NOMIR's value and whether there were other problems relating to the protection of NOMIR's unique intellectual property.

46.     On or about September 4, 2007, MWE filed a Petition to Revive for unintentional abandonment.

47.     On or about September 20, 2007, strictly by accident, NOMIR's misplaced file at MWE was discovered in a search for the replacement file.

48.     On or about October 31, 2007, MWE filed a Supplemental Petition for Revival and a Petition to Accelerate consideration of the Petition to Revive. In these documents MWE largely conceded the facts alleged above.

49.     On or about November 23, 2007, the USPTO issued to MWE its Decision on

Petition, granting the Petition to Revive and the Petition to Accelerate, and reinstating the Application retroactive to the initial Application date of October 8, 2004.

50.     In or about January, 2008, NOMIR terminated MWE as its counsel and retained Foley & Lardner LLP ("Foley") as successor counsel.

51.     On or about September 20, 2009, the USPTO issued to Foley a Notice of Allowance of the Application for issuance of a patent ("Patent no. 013").

52.     Patent no. 013 has immediate medical use in the treatment of periodontal disease and has applications in other medical uses such as wound decontamination and bioburden reduction.  It therefore has high commercial value in an industry that is expanding and in need of better products.

53.     The unintended abandonment inhibited NOMIR's efforts to raise capital, conduct clinical trials and develop related products and applications of technology in conjunction with Patent no. 013 for the treatment of periodontal disease.  Such related products, known as "convoyed" products, were expected to be marketed profitably in direct sequence to Patent no. 013.

54.     The unintended abandonment also placed NOMIR at a time disadvantage in the race with competing ventures to enter the rapidly expanding market for "anti-biofilm" and periodontal disease treatment technology. Competing ventures, including but not limited to Ondine Biopharma Corp., took the lead in laser/periodontal technology.

55.     Revenues from marketing of convoyed products were delayed as a consequence of the delay in the marketing of Patent no. 013.

56.     Further, the extension of use of the technological innovation associated with Patent no. 013 to medical use for wound decontamination and bioburden reduction was also

delayed. In particular, without limitation, a scheduled clinical study was delayed indefinitely as a direct result of the financial problems associated with the unintended abandonment.

57.     MWE knew, or should have known, from the outset of its relationship with NOMIR that the development and marketing of NOMIR's patented technologies and products were and are its only means of achieving revenue streams and that NOMIR was, and is, raising investor capital and securing marketing contracts with viable companies.

58.     NOMIR has suffered and continues to suffer short term damages which include but are not limited to the following:

a.     The loss of $2 to $3 Million in financing;

b.     The suspension of clinical studies resulting from loss of financing; and

c.     The diversion of NOMIR's top executives to the abandonment issue.

59.     NOMIR has also suffered and continues to suffer long term damages which include but are not limited to the following:

a.     The loss of over 2½ years of Patent no. 013's patent life;

b.     Erosion of confidence in NOMIR in the investment community;

c.     Reputation damage due to the stigma of abandonment attached to the NOMIR name;

d.     Erosion of confidence among NOMIR's national and international marketing partners;

e.     Erosion of NOMIR's reputation within the academic community where studies and clinical studies are conducted; and

f.     Continued inhibition of the launch of NOMIR's anti-biofilm technology.

60.     Total actual damages exceed $600,000 and the present value of anticipated lost revenues as of January 1, 2009 are expected to reach $22.4 Million.

The 032, 034, 075 and 076 Applications

61.     On April 21, 2005, at the direction of MWE, the PCT application corresponding to the basic 013 Application ("013 PCT Application") was published.

62.     NOMIR's provisional patent application, MWE Docket no. 72287-032 (the "032 Application") and provisional application, MWE Docket No. 72287-034 (the "034 Application") represent significant medical advancements through apparatus and methods for eliminating live biofilms and treating diseased tissue.  They focus on the subject matter of NOMIR's 013 Application by expanding the patent claims into the general medical arena with therapies and designs for combating biofilms in infected prosthetic joints.

63.     Biofilms are to blame in a myriad of human diseases which are difficult to treat. These applications therefore have high commercial value.

64.     The purpose of a provisional application is to secure an early priority date.

65.     The 032 and 034 Applications were filed on July 21, 2005, and, therefore, each secured a priority date of July 21, 2005.

66.     Instead of timely converting within twelve months, the provisional 032 and 034 Applications into respective utility applications by July 21, 2006, MWE abandoned each provisional application.

67.     Had MWE timely converted the provisional 032 and 034 Applications to utility applications this would have expanded the scope of the 013 PCT Application into the medical arena with the technology covered by the 032 and 034 Applications.

68.     As a result of MWE's abandonment of the 032 and 034 Applications, NOMIR forever lost the early July 21, 2005 priority date.

69.     On July 24, 2006, Levi-Minzi and MWE belatedly refiled the abandoned 032 and

034 Applications as new provisional applications, MWE Docket No. 72287-0075 (the "075 Application") and MWE Docket no. 72287-0076 (the "076 Application"), but failed to disclose to NOMIR that, as a result, the effective priority date for claims directed to this valuable medical technology was now July 24, 2006, not July 21, 2005, and that this technology could not and could never be protected.

70.     Because the April 21, 2005, publication date of the 013 PCT Application is more than one year prior to the July 24, 2006, priority date of the related 075 and 076 Applications, the 013 PCT Application became prior art without the technology covered by the abandoned 032 and 034 Applications.

71.     Levi-Minzi also failed to disclose that the 013 PCT application became statutory prior art, without the technology covered by the abandoned 032 and 034 Applications.

72.     Levi-Minzi and MWE knew, or should have known, that the 013 PCT Application publication without the 032 and 034 Applications forever lost the protection of the technology covered by the 032 and 034 Applications, and the 075 and 076 Applications were essentially useless.

73.     The only purpose in filing the 075 and 076 Applications was to mislead NOMIR to believe that its valuable technology was protected, although this was untrue.

74.     MWE had a professional responsibility to assist NOMIR to obtain valid patents with maximum coverage, and to disclose immediately problems as they arose.

75.     MWE did not notify NOMIR of this problem until August 17, 2007, when McCloskey advised NOMIR only of the belated refiled 075 and 076 Applications of July 24, 2006. From that information NOMIR was thereafter able to discern the problem.

76.     Levi-Minzi, McCloskey and MWE knew that NOMIR was soliciting investors

based upon the belief that NOMIR possessed the ability to fully patent the technology represented by the 013 PCT Application as expanded by the 032 and 034 Applications.

77.     MWE's failure to disclose to NOMIR on or shortly after July 21, 2006, that the 013 PCT Application had become statutory prior art, misled NOMIR to believe that it had the ability to patent the expanded technology of the 013 PCT Application and the 032 and 034 Applications.

78.     To further mislead NOMIR, MWE and McCloskey filed utility patent application, MWE Docket no. 072287-0094 (the "094 Application"), and utility patent application, MWE Docket no. 072287-0095 (the "095 Application"), on January 24, 2007, to convert the 075 and 076 Applications although the 075 and 076 Applications were useless, thereby continuing to mislead NOMIR to believe that the technology represented by the 013 PCT Application expanded by the 075 and 076 Applications was fully protected when in fact the 013 Application could not be expanded due to MWE's abandonment of the 032 and 034 Applications.

79.     In an email dated July 5, 2007, McCloskey disclosed to Bornstein that the 075 and 076 Applications were not in MWE's system in Word format and he was only able to locate them in Levi-Minzi's laptop computer.

80.     NOMIR relied on the expectation that the 013 PCT Application as expanded by the 075 and 076 Applications could be patented and solicited investors based upon that understanding.

81.     Had MWE disclosed the truth to NOMIR on a timely basis, NOMIR would have immediately responded by, among other things, notifying existing and potential investors about the problem, which NOMIR had a contractual, fiduciary, and ethical obligation to do.

82.     As a result of the delay in disclosure, NOMIR incurred additional costs and

damages to its reputation, among other damages.

83.    As a further result of MWE's misconduct, including a faulty docketing system, the scope of patent protection afforded NOMIR's core technology in the medical field has been irreparably compromised if not substantially eradicated.

84.    As a result, NOMIR has suffered and continues to suffer short term damages which include but are not limited to unabsorbed overhead, unallocated costs, and extra expenses of about $125,000.

85.    NOMIR has also suffered damage to its reputation. Among other things, without limitation, investors and potential investors have lost confidence in the strength of the patent protection to NOMIR's core technologies generally as a result of MWE's errors.

86.    Furthermore, NOMIR has suffered and continues to suffer long term damages from the loss of patent protection under the 032 and 034 Applications which include but are not limited to, lost profits with a present value as of January 1, 2009, expected to reach $120.6 Million.

The 016 Application

87.    On June 25, 2004, MWE filed on behalf of NOMIR International Patent Application no. PCT/US04/020520, MWE Docket no. 72287-0016 (the "016 Application") titled "Instrument for Delivery of Optical Energy to the Dental Root Canal System for Hidden Bacteria and Live Biofilm Thermolysis".

88.    The 016 Application relates to a system for the thermolytic eradication of bacteria and biofilm in the human body and, more particularly, for the treatment of atypical periodontitis in and around the dental structure of endodontically involved teeth.

89.    The 016 Application will improve treatment of bacterially fueled inflammatory

diseases by effectively destroying live biofilm bacteria without harming health, dental, or other peripheral tissues. It therefore has high commercial value.

90.     By email dated February 14, 2006, Angelo J. Mignanelli, in MWE's Miami office, forwarded to Bornstein a copy of the published 016 Application.

91.     Levi-Minzi knew, or should have know, that the 016 Application needed to be amended in a similar manner to the amendment of NOMIR's related U.S. Patent Application (the "015 Application") which was amended in early 2007, to include a certain "photo-damage" claim.

92.     Although MWE was responsible for notifying responsible individuals of the applicable due dates, no notices were given to NOMIR, and NOMIR was never advised, of the applicable deadline for amending the 016 Application.

93.     The 016 Application was incorrectly listed in MWE's docket system as "expired."

94.     On October 3, 2006, Eric Olson, an MWE IP Assistant, notified Burtt by email that the 016 Application had proceeded through Chapter I and II of the Patent Cooperation Treaty.

95.     Consequently, unbeknownst to NOMIR, it was now too late to amend the 016 Application to conform to the 015 Application with a similar photo-damage claim.

96.     As a result, the 016 Application was allowed in an incomplete state under international Patent no. 1732463, which became effective on July 29, 2009.

97.     NOMIR first became aware that it had lost the opportunity to amend the 016 Application on or about July 29, 2009, when Foley notified NOMIR that the patent was allowed.

98.     Levi-Minzi, McCloskey and MWE knew that NOMIR was soliciting investors based upon the belief that NOMIR possessed the ability to fully patent the technology

represented by the 015 Application and the 016 Application.

99.     MWE's failure to disclose to NOMIR on or shortly after October 3, 2006, that NOMIR could not amend the 016 Application, misled NOMIR to believe that the 016 Application could be amended.

100.     NOMIR relied on the expectation that the 016 Application could be amended and solicited investors based upon that understanding.

101.     Had MWE disclosed the truth to NOMIR on a timely basis, NOMIR would have immediately responded by, among other things, notifying existing and potential investors about the problem, which NOMIR had a contractual, fiduciary, and ethical obligation to do.

102.     As a result of the delay in disclosure, NOMIR incurred additional costs and damages to its reputation, among other damages.

103.     Furthermore, as a consequence of the failure to amend the 016 Application, its economic value has been substantially reduced, causing NOMIR substantial losses and damage.

104.     In an effort to mitigate damages, Foley has filed a divisional application on behalf of NOMIR which is currently pending.

<u>COUNT I – NEGLIGENCE CLAIM AGAINST ALL DEFENDANTS</u>

105.     NOMIR realleges and incorporates by reference paragraphs 7 through 104, above, as if specifically set forth herein.

106.     The defendants had a duty to timely pursue and protect the 013 Application, the 032 Application, the 034 Application and the 016 Application in a proper, skillful and diligent manner, and to promptly advise NOMIR of all deadlines, USPTO office actions, and the abandonment of any applications.

107.     MWE failed to exercise due care in pursuing and protecting NOMIR's rights and

interests by, among other things;

    a.    failing to file the required reply to the Notice to Provide Missing Parts;

    b.    abandoning the 013 Application, the 032 Application and the 034 Application;

    c.    Failing to promptly advise NOMIR of the abandonment of NOMIR's applications;

    d.    permitting the 013 PCT Application to become statutory prior art without the technology covered by the 032 and 034 Applications;

    e.    failing to promptly disclose to NOMIR that the 013 PCT Application had become statutory prior art;

    f.    failing to amend the 016 Application;

    g.    failing to promptly advise NOMIR of the deadline to amend the 016 Application;

    h.    failing to maintain a reliable docketing system;

    i.    failing to provide adequate supervision of those to whom MWE delegated NOMIR's IP work.

108.    As a result of the defendants' negligence, NOMIR has suffered substantial damages as hereinbefore alleged.

## COUNT II — FRAUD CLAIM AGAINST ALL DEFENDANTS

109.    NOMIR realleges and incorporates by reference paragraphs 7 through 108, above, as if specifically set forth herein.

110.    The defendants misled NOMIR with the intent to deceive by among other things:

    a.    failing to disclose that the 013 Application had been abandoned and issuing false status reports representing that the 013 Application was in good standing as alleged above in par. 28-33;

    b.    failing to disclose that MWE had abandoned the 032 and 034 Applications and that the 013 PCT Application had become statutory prior art as alleged above in par. 66-73;

    c.    misleading NOMIR to believe that the valuable technology of the 013 PCT Application expanded by the 032 and 034 Applications was protected

16

by filing the useless 075, 076, 094, and 095 Applications as alleged above in par. 69-73 and 78;

d.   failing to disclose that NOMIR lost the opportunity to amend the 016 Application as alleged above in par. 94-99; and

e.   representing that MWE had expertise in handling IP matters as alleged above in par. 10, when in fact this was untrue.

111.   NOMIR relied upon the aforesaid misrepresentations to its detriment.

112.   As a result of the defendants' fraud, NOMIR has suffered substantial damages as hereinbefore alleged.

## COUNT III – NEGLIGENT MISREPRESENTATIONS
## CLAIM AGAINST ALL DEFENDANTS

113.   NOMIR realleges and incorporates by reference paragraphs 7 through 112, above, as if specifically set forth herein.

114.   The aforesaid misrepresentations and failures to disclose the truth were made by the defendants negligently in breach of the duty of care owed to NOMIR.

115.   As a result of the defendants' negligent misrepresentations, NOMIR has suffered substantial damages as hereinbefore alleged.

## COUNT IV – BREACH OF FIDUCIARY DUTY
## CLAIM AGAINST ALL DEFENDANTS

116.   NOMIR realleges and incorporates by reference paragraphs 7 through 115, above, as if specifically set forth herein.

117.   The defendants had a duty to exercise the utmost care, good faith and integrity in all of their dealings with NOMIR in light of the attorney/client relationship which existed between the defendants and NOMIR.

118.   The defendants breached their fiduciary duty to NOMIR.

119.   As a result of the defendants' breaches of fiduciary duty, NOMIR has suffered

substantial damages as hereinbefore alleged.

### COUNT V – BREACH OF WRITTEN CONTRACT CLAIM AGAINST MWE

120.   NOMIR realleges and incorporates by reference paragraphs 7 through 119, above, as if specifically set forth herein.

121.   NOMIR and MWE entered into a written agreement whereby MWE agreed to pursue and protect patent applications and patents on behalf of NOMIR and NOMIR agreed to pay MWE for said services.

122.   NOMIR has duly performed all conditions in the agreement between the parties on its part required to be performed.

123.   MWE has breached its written contract with NOMIR by, among other things, failing to timely pursue and protect NOMIR's applications and patents and to promptly advise NOMIR of all deadlines, U.S.P.T.O. office actions, and the abandonment of NOMIR's Applications.

124.   As a result of MWE's breaches of contract, NOMIR has suffered substantial damages as hereinbefore alleged.

### COUNT VI – BREACH OF ORAL CONTRACT CLAIM AGAINST MWE

125.   NOMIR realleges and incorporates by reference paragraphs 7 through 124, above, as if specifically set forth herein.

126.   NOMIR and MWE entered into an oral agreement whereby MWE agreed to pursue and protect patent applications and patents on behalf of NOMIR and NOMIR agreed to pay MWE for said services.

127.   NOMIR has duly performed all conditions in the oral agreement between the parties on its part required to be performed.

128.   MWE has breached its oral contract with NOMIR by, among other things, failing to timely pursue and protect NOMIR's applications and patents and to promptly advise NOMIR of all deadlines, USPTO office actions, and the abandonment of NOMIR's Applications.

129.   As a result of MWE's breaches of contract, NOMIR has suffered substantial damages as hereinbefore alleged.

### COUNT VII – BREACH OF IMPLIED-IN-FACT CONTRACT CLAIM AGAINST MWE

130.   NOMIR realleges and incorporates by reference paragraphs 7 through 129, above, as if specifically set forth herein.

131.   NOMIR and MWE entered into an implied-in-fact agreement whereby MWE agreed to pursue and protect patent applications and patents on behalf of NOMIR and NOMIR agreed to pay MWE for said services.

132.   NOMIR has duly performed all conditions in the implied-in-fact agreement between the parties on its part required to be performed.

133.   MWE has breached its implied-in-fact contract with NOMIR by, among other things, failing to timely pursue and protect NOMIR's applications and patents and to promptly advise NOMIR of all deadlines, USPTO office actions, and the abandonment of NOMIR's Applications.

134.   As a result of MWE's breaches of contract, NOMIR has suffered substantial damages as hereinbefore alleged.

### COUNT VIII – BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALINGS CLAIM AGAINST MWE

135.   NOMIR realleges and incorporates by reference paragraphs 7 through 134, above, as if specifically set forth herein.

136. By reason of the foregoing, MWE has breached the implied covenant of good faith and fair dealing which was implied in the relationship between MWE and NOMIR and in the agreements between them.

137. As a result of MWE's breaches of the implied covenant of good faith and fair dealings, NOMIR has suffered substantial damages as hereinbefore alleged.

<u>COUNT IX – UNFAIR AND DECEPTIVE PRACTICES</u>
<u>CLAIM AGAINST ALL DEFENDANTS</u>

138. NOMIR realleges and incorporates by reference paragraphs 7 through 137, above, as if specifically set forth herein.

139. NOMIR and the defendants are engaged in trade or commerce within the meaning of G.L. c. 93A, sec. 1.

140. The acts and practices alleged above constitute unfair and deceptive acts or practices in violation of G.L. c. 93A, sec. 2. These acts and practices include, but are not limited to the acts and practices set forth above in par. 110.

141. The defendants' use or employment of said acts or practices were willful or knowing violations of G.L. 93A, sec. 2.

142. As a result of the defendants' unfair and deceptive acts and practices, NOMIR has suffered substantial damages as hereinbefore alleged.

<u>JURY CLAIM</u>

NOMIR claims a trial by jury for all of the issues so triable.

WHEREFORE, THE PLAINTIFF, NOMIR MEDICAL TECHNOLOGIES, INC., RESPECTFULLY DEMANDS THAT THIS HONORABLE COURT:

1. Enter judgment against the defendants, jointly and severally, in such amount as the Court deems proper and just;

2.   Order the defendants to pay to NOMIR three times such damages as have been sustained in consequence of MWE's unfair and deceptive acts or practices pursuant to G.L. c. 93A, §11;

3.   Order the defendants to pay the costs of this action and reasonable attorneys' fees pursuant to G.L. c. 93A, §11; and

4.   Grant such further relief as may be equitable and just.

> Respectfully submitted,
> NOMIR MEDICAL TECHNOLOGIES, INC.
> Plaintiff
> By its attorneys
> COHAN RASNICK MYERSON LLP
>
> _____
> Robert D. Cohan  (BBO #088300)
> One State Street, Suite 1200
> Boston, MA  02109
> (617) 742-1820

C:\MYFILES\N\NOMIR\Complaint.doc

21

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. 10-2652 BLS | Trial Court of Massachusetts Superior Court Department County: SUFFOLK |
|---|---|---|

| PLAINTIFF(S) NOMIR Medical Technologies, Inc. | DEFENDANT(S) McDermott Will & Emery LLP, Somona Levi-Minzi, Mark Lappin and G. Matthew McCloskey |
|---|---|

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE Robert D. Cohan, Cohan Rasnick Myerson LLP One State St., Suite 1200, Boston, MA 02109 617-742-1820 Board of Bar Overseers number: 088300 | ATTORNEY (if known) |
|---|---|

Origin Code

Original Complaint

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| BL 1 | Legal Malpractice | ( B* ) | (XX) Yes    ( ) No |

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

This is an action for legal malpractice arising out of the failure of the defendants to timely and properly pursue and protect patent applications on behalf of the plaintiff resulting in the negligent abandonment of those applications and other losses. The applications represented valuable technology for the treatment of infectious disease, the plaintiffs' core technology, and the plaintiff has suffered damages in excess of $143 Million.

This action is appropriate for the BLS under Administrative Directive No. 09-1 because it is a claim involving intellectual property under Subsection D.1 and, in particular, the loss of intellectual property resulting from the defendants' negligence. It is also a malpractice claim by a business enterprise against professionals under Subsection I.1. Finally, this is a claim of unfair trade practices involving complex issues under Subsection H.2 because of the complexity of the failures by the defendants to protect the plaintiff's patent applications and the complexity of the calculation of damages arising from the loss of these patents, which involves market studies and economic loss projections.

*A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record _____     DATE: 7/1/10

AOTC-6 mic005-11/99
A.O.S.C. 1-2000

## CIVIL ACTION COVER SHEET
## INSTRUCTIONS

### SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

A.1 claims relating to the governance and conduct of internal affairs of entities
A.2 claims relating to employment agreements
A.3 claims relating to liability of shareholders, directors, officers, partners, etc

B.1 shareholder derivative claims
B.2 claims relating to or arising out of securities transactions

C.1 claims involving mergers, consolidations, sales of assets, issuance of debt, equity and like interests

D.1 claims to determine the use or status of, or claims involving, intellectual property
D.2 claims to determine the use or status of, or claims involving, confidential, proprietary or trade secret information
D.3 claims to determine the use or status of, or claims involving restrictive covenants

BE.1 claims involving breaches of contract or fiduciary, fraud, misrepresentation, business torts or other violations involving business relationships

BF. 1 claims under the U.C.C. involving complex issues

BG.1 claims arising from transactions with banks, investment bankers and financial advisers, brokerage firms, mutual and money funds

BH.1 claims for violation of antitrust or other trade regulation laws
BH.2 claims of unfair trade practices involving complex issues

BI. 1 malpractice claims by business enterprises against professionals

BJ.1 claims by or against a business enterprise to which a government entity is a party

BK.1 other commercial claims, including insurance, construction, real estate and consumer matters involving complex issues

### TRANSFER YOUR SELECTION TO THE FACE SHEET.

EXAMPLE:

| CODE NO. | TYPE OF ACTION (SPECIFY) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| BD3 | Restrictive covenants | * (B) | [X] Yes   [ ] No |

DUTY OF THE PLAINTIFF. The plaintiff, or plaintiff's counsel, shall set forth, on the face sheet, a statement specifying in full detail the facts upon which the plaintiff then relies for "presumptive" entry into the Business Litigation Session. A copy of the civil action cover sheet shall be served on all defendants, together with the complaint.

DUTY OF THE DEFENDANT. Should the defendant contest the entry into the Business Litigation Session, the defendant shall file with the answer (or dispositive motion) a statement specifying why the action does not belong in the Business Litigation Session. Such Statement shall be served with the answer (or dispositive motion).

### A CIVIL ACTION COVER SHEET MUST BE FILED WITH EACH COMPLAINT.

### FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY MAY RESULT IN THE TRANSFER OF THIS ACTION FROM THE BUSINESS LITIGATION SESSION TO ANOTHER APPROPRIATE SESSION OF THE SUPERIOR COURT.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Initial Rule 16 Conference.

Commonwealth of Massachusetts
County of Suffolk
The Superior Court

CIVIL DOCKET#: SUCV2010-02652-BLS2

RE:   Nomir Medical Technologies Inc v McDermott Will & Emery LLP et al

## NOTICE OF ACCEPTANCE INTO BUSINESS LITIGATION SESSION

This matter has been accepted into the Suffolk Business Litigation Session. It has been assigned to **BLS2**.

Hereafter, as shown above, all parties must include the initials "BLS2" at the end of the docket number on all filings.

Counsel for the plaintiff(s) is hereby advised that within seven (7) days of the filing of an appearance, answer, motion or other response to the complaint by or on behalf of the defendant(s) which has been served with process with in the time limitation of Mass. R. Civ. P. Rule 4(j), or such other time as may be modified by the Court, he or she shall send notice thereof to the **BLS2** Session Clerk, Suffolk Superior Court, Three Pemberton Square, Boston, MA 02108.

Upon receipt of such notice, the Court will issue a Notice of Initial Rule 16 Conference for purposes of meeting with all counsel.  Before the Rule 16 conference counsel shall discuss with their clients and with opposing counsel whether the parties will participate in the BLS Pilot Project on Discovery (counsel are directed to http://www.mass.gov/courts/courtsandjudges/courts/superiorcourt/index.html for description of the Project).  Counsel may indicate their respective client's participation by completing, filing and serving the attached form. If by the date of the initial Rule 16 Conference, not all parties have given notice of their participation, counsel shall be prepared to discuss at that conference whether their clients will participate in the Pilot Project.

The Court requests that plaintiff's counsel serve on opposing parties a copy of this notice and the attached form.

Dated: 07/09/2010

Hon. Margaret R. Hinkle

Commonwealth of Massachusetts
County of Suffolk
The Superior Court

CIVIL DOCKET#: SUCV2010-02652-BLS2

RE:   Nomir Medical Technologies Inc v McDermott Will & Emery LLP et al

As you may know, the Business Litigation Session is implementing a Discovery Pilot Project, beginning in January, 2010. This pilot project is available on a voluntary basis for all new cases accepted into the BLS and for cases which have not previously had an initial case management conference. Counsel should be prepared to discuss the pilot project with the Court at the initial case management conference. For a detailed copy of the BLS Pilot Project, counsel are directed to the Trial Court home page at: http://www.mass.gov/courts/courtsandjudges/courts/superiorcourt/index.html)

If a party is willing to participate in the project, that party's counsel should so indicate below and return this form to the appropriate session clerk.

Yes,_____is willing to participate in the Discovery Pilot Project.
(Party's Name)

Case Name Nomir Medical Technologies Inc v McDermott Will & Emery LLP et al

Docket Number CIVIL DOCKET#: SUCV2010-02652

Counsel For_____        Date_____

Firm Name and Address

_____

_____

_____

Please sign and return to:  Helen Foley, Asst. Clerk  .OR  Claire Walsh, Asst. Clerk
BLS , Rm. 1309                          BLS 2, Rm. 1017
Suffolk Superior Court                  Suffolk Superior Court
3 Pemberton Square                      3 Pemberton Square
Boston, MA 02108                        Boston, MA 02108

cvdblsaccept_1.wpd 3763599 bkset sultsalt